HANSEN, Respondent, v. POCK, Appellant.

(No. 4,058.)

(Submitted December 11, 1919.  Decided January 2, 1920.)

[187 Pac. 282.]

*Physicians and Surgeons—Negligent Treatment of Patient—*
*Damages—Liability—Rule—Appeal and Error—Briefs.*

Physicians and Surgeons—Treatment—Degree of Skill to be Exercised—
Rule.
1.  When one holds himself out as a physician or surgeon, whether
licensed or not, and accepts employment as such to treat a patient, he
assumes toward the latter the obligation to exercise such reasonable
care and skill in that behalf as is usually exercised by physicians or
surgeons of recognized schools who practice in the community in which
he resides, having due regard to the condition of medical or surgical
science at that time.

Same—Unjustifiable Treatment of Patient—Liability of Chinese Doctor.
2.  *Held,* under the above rule, that a Chinese herb doctor who held
himself out as able to cure any kind of chronic disease was liable in
damages to the widow of a patient who died after treatment for dis-
ease of the kidneys by defendant, when in fact he was, and had been
for some twenty years, suffering from pulmonary tuberculosis, which
treatment could not be justified by the rules of recognized schools of
medicine.

[As to the degree of care and skill required of physicians, see notes
in 1 Ann. Cas. 306; 14 Ann. Cas. 605.]

Appeal—Refusal of Offered Instruction—Briefs.
3.  Unless counsel in appellant's brief points out in what respect
there was error in refusing an offered instruction and wherein ap-
pellant suffered prejudice by the alleged error, the assignment will
be disregarded.

*Appeal from District Court of Silver Bow County, in the*
*Second Judicial District; Jos. C. Smith, a Judge of the Fifth*
*District, presiding.*

Action by Minnie Hansen, as executrix of the estate of
Rasmus Hansen, deceased, against Huie Pock. Judgment for
plaintiff. Defendant appeals from it and an order denying a
new trial.

*Affirmed.*

*Mr. W. E. Carroll,* for Appellant, submitted a brief; *Mr. Wellington D. Rankin,* of Counsel, and *Mr. Carroll* argued the cause orally.

If a physician adopted a treatment not of any particular school in the abstract, but of his own particular school, which he publicly professed and practiced, and the medical testimony offered by the plaintiff in an action against him for malpractice related to treatment prescribed by a different school, such testimony should be weighed, not alone with regard to bias or prejudice influencing the testimony of the witnesses, but with regard to bias or prejudice which might influence or malign the jury in favor of one school rather than the other. (*Force* v. *Gregory,* 63 Conn. 167, 38 Am. St. Rep. 371, 22 L. R. A. 343, 27 Atl. 1116.)

Thompson on Negligence, section 6711, says: "The implied agreement of the physician or surgeon is that no injurious consequences shall result to his patient from want of proper skill, care or diligence. If lack of skill or care is not the proximate cause of an injury to a patient, there is no breach of the physician or surgeon's obligation, and there can be no recovery." (Citing *Ewing* v. *Goode,* 78 Fed. 442; *Lamphier* v. *Phipos,* 8 Car. & P. 475.)

Each school of medicine is entitled to practice in its own way, and because one does not use the other's methods will not constitute malpractice. (*Ennis* v. *Banks,* 95 Wash. 513, 164 Pac. 58.) The question whether there was or was not negligence is one of law for the court. (*Adolay* v. *Miller,* 60 Ind. App. 656, 111 N. E. 313.) Permitting treatment by a physician after being informed or becoming fully aware of his want of skill is contributory negligence, which will bar an action for resulting injuries. (*Lorenz* v. *Jackson,* 88 Hun, 200, 34 N. Y. Supp. 652; *Gates* v. *Fleischer,* 67 Wis. 504, 30 N. W. 674.)

The attention of the court is especially called to the case of *Dorris* v. *Warford,* 124 Ky. 768, 9 L. R. A. (n. s.) 1090, 100 S. W. 312, as it appears in 14 Ann. Cas., page 602, as bearing upon the instructions in the case at bar.

*Mr. W. E. Keeley, Mr. M. H. Canning, Mr. P. E. Geagan* and *Mr. E..P. Kelly,* for Respondent, submitted a brief; *Mr. Keeley* argued the cause orally.

The law relative to the case is summed up in the following: "A school of medicine, to be entitled to recognition  *  *  * must have rules and principles of practice for the guidance of all of its members as respects principles, diagnosis and remedies, which each member is supposed to observe in any given case. A class of practitioners who have no fixed principles or formulated rules for the treatment of diseases must be held to the duty of treating patients with the ordinary skill and knowledge of physicians in good standing." (22 Am. & Eng. Ency. of Law, 2d ed., 801, quoted and approved in *Grainger* v. *Still,* 187 Mo. 197, 70 L. R. A. 49, 55, 85 S. W. 1114. See, also, *Williams* v. *Poppleton,* 3 Or. 139; *Nelson* v. *Harrington,* 72 Wis. 591, 7 Am. St. Rep. 90, 1 L. R. A. 719, 40 N. W. 228; *Longan* v. *Weltmer,* 180 Mo. 322, 103 Am. St. Rep. 573, 64 L. R. A. 969, 79 S. W. 655 (magnetic healer); *Lynch* v. *Davis,* 12 How. Pr. (N. Y.) 323; *Almond* v. *Nugent,* 34 Iowa, 300, 11 Am. Rep. 147; *McCandless* v. *McWha,* 22 Pa. St. 261; *Rex* v. *Long,* 4 Car. & P. 398; *Rex* v. *Van Butchell,* 3 Car. & P. 629; *Carpenter* v. *Blake,* 60 Barb. (N. Y.) 488; Shearman & Redfield on Negligence, 2d ed., sec. 437.)

It has always been held that because the rules whereby damages in a malpractice case are to be measured are vague and uncertain, the jury are the proper judges of the amount of damages to be allowed, and unless there is something in the case showing that the jury, in their determination, were influenced by passion, prejudice or some other improper motive, the court will not interfere. (*Chamberlain* v. *Porter,* 9 Minn. 260; *Howard* v. *Grover,* 28 Me. 97, 48 Am. Dec. 478.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Action by Rasmus Hansen to recover damages alleged to have been suffered by him through negligent and careless treatment

by the defendant, who is a Chinese herb doctor and physician. From a judgment in favor of Hansen and from an order denying a new trial, defendant has appealed. After the cause was removed to this court, Hansen died, and the name of Minnie Hansen, his executrix, was substituted as plaintiff in his stead.

For some twenty years prior to August 16, 1913, Hansen had been suffering from pulmonary tuberculosis, so that the disease had become chronic. From time to time he had been under the care of various regular physicians at Deer Lodge, near which place he resided on a farm, and of specialists who resided in St. Louis and Kansas City, Missouri, to whom he had gone hoping to be cured. These had all pursued substantially the same course of treatment, prescribing creosote and cod liver oil in varying proportions, but none of them held out to Hansen hope of complete recovery, advising him that their treatment would serve only to check the progress of the disease and perhaps prolong his life. In 1910 he was under the care of Dr. Dye, of Deer Lodge, but concluding that he was not being benefited by Dr. Dye's treatment, he ceased to employ him and was not thereafter under the care of any physician until August 16, 1913, when he employed the defendant. Gradually he had grown weaker from the ravages of the disease, until he had ceased active work on his farm. He had at times expectorated some blood, but had not suffered from hemorrhage until August 15, when he had one of some violence. He was much discouraged by this and determined to consult the defendant. He was induced to do this by having his attention accidentally called to the following advertisement, published in the "Butte Evening News," of that date:

"Dr. Huie Pock. Professional services to the public, and a guaranty of a sure cure for all kinds of diseases, including chronic cases of long standing. Also all complaints and weaknesses entirely cured. No. 227, S. Main St., Ind. Phone. 5152."

On August 16 he went to Butte in company with his wife, and to defendant's place of business, where the latter conducted a store as well as gave treatment to those who went there for

that purpose. The defendant examined him superficially by feeling his pulse and inspecting his tongue, though Hansen gave him a history of his case, telling him that he had suffered from hemorrhages due to tuberculosis. The defendant made no examination of his lungs nor did he test his sputum or urine, informing him that his trouble was not tuberculosis but a disease of the kidneys, which he could cure. Hansen thereupon put himself under defendant's care for treatment. He thereafter took the medicine prescribed by the defendant, prepared from herbs which defendant stated had been brought from China. He was required to visit defendant's place, first, every third day, then every fourth, and finally every tenth day. These visits continued until March 6, 1914, when Hansen, realizing that, though he had not thereafter suffered from hemorrhage, his condition was not being improved, but that, on the contrary, he was growing weaker, ceased to visit the defendant and to take the medicine furnished by him.

The complaint charges: That defendant, having entered upon the employment, ''did not use due and proper care or skill in endeavoring to cure plaintiff from the said disease or malady, to-wit, tuberculosis or consumption, in this: that, whereas, the plaintiff was then and there suffering with what is commonly known and designated by physicians as a chronic disease or malady of tuberculosis or consumption, the defendant treated the plaintiff for a kidney disease or disorder, and continuously so treated the plaintiff for said kidney disease or disorder from the sixteenth day of August, 1913, to on or about the sixth day of March, 1914, inclusive; that except as a result of tuberculosis or consumption, the plaintiff was not at any of the time above mentioned suffering with any  *  *  *  disease or disorder; that  *  *  *  through lack of care and attention to the disease or malady with which plaintiff was then suffering, this plaintiff well-nigh died, and the ravages of consumption or tuberculosis, having gone on unchecked in plaintiff's body, made the plaintiff so weak that he was unable to stand or walk without assistance.''

The defendant in his answer admitted that he had been em-
ployed by plaintiff; that he had informed him that he was
affected by a disease of the kidneys; and that he could cure
him provided he would follow defendant's prescribed course
of treatment for a sufficient length of time. He admitted that
he had treated plaintiff during the time alleged, but denied that
he had been guilty of negligence or that he had failed to use
proper care and skill in doing so. As an affirmative defense
he alleged, in substance, that for more than thirty years he had
been skilled in the practice of medicine and the use of herb
compounds; that his knowledge had been gained by many years'
study in the schools of medicine established according to the
customs and laws of China, and from his practice; that he had
never professed to practice medicine as known to any other race
of people, except so far as the practice pursued by him was
common to Chinese methods and those of established schools of
other races; that plaintiff consulted him with actual knowledge
that he was a Chinese physician and solicited his services and
skill as such, and not otherwise; that plaintiff entered into a
verbal contract with him for treatment for a kidney disease of
long standing, agreeing that he (plaintiff) would submit to the
treatment and faithfully use the compounds prescribed by de-
fendant, for a period of time sufficient to enable defendant to
effect a cure; that on or about March 16, 1914, plaintiff volun-
tarily, and without notice to defendant, abandoned the contract
and through his own fault thereafter ceased to receive the bene-
fit of defendant's treatment; that the disease was of a wasting
nature, and, being of long standing, required treatment for a
much longer time than that which defendant had been per-
mitted to treat it, and that, if plaintiff had been injured in his
health or had suffered from the ravages of tuberculosis, such
result was caused by his own fault in failing to follow the course
prescribed by defendant.

In his reply, plaintiff admitted that he solicited the services
of the defendant, with knowledge that he was a Chinese physi-
cian; that he entered into a contract with him for his services

in that capacity, and accepted his treatment until he voluntarily ceased to visit him and to use the compounds prescribed by him.   The other allegations he put in issue by general denial.

The principal contention made by counsel is that the evidence does not justify the verdict.   They contend that testimony of physicians of recognized American schools, introduced by plaintiff, that defendant's diagnosis and treatment could not be justified from any point of view, was not sufficient to convict him of a lack of ordinary care and skill, and that if this be conceded, the evidence otherwise fails to show that plaintiff was injured.   This contention must be overruled.   The evidence is voluminous.   It will not be necessary to set it forth and subject it to a critical analysis, however, for the reason that the salient facts are not seriously controverted.   It will suffice for present purposes to state generally the inferences which it warrants and determine whether, under the rules of law applicable, the contention of counsel is maintainable.

It is admitted by the pleadings that the plaintiff employed the defendant as a Chinese physician.   Defendant alleged that the plaintiff was at that time suffering from a kidney disease, and thus tendered an issue upon the question whether he was suffering from chronic tuberculosis; but it is not seriously controverted in the evidence that plaintiff was suffering from this disease nor was there any evidence, other than that of defendant, that he was affected with any other disease.   There is no controversy but that after the superficial examination described above, the defendant directed the plaintiff to discard entirely the use of eggs, chicken and milk as food, which had theretofore been his diet, and also to refrain from drinking cold water; that he prescribed a concoction of herbs which he said had been brought from China, requiring plaintiff to take it daily and to visit him as above stated; that the plaintiff remained under his treatment for seven months; that as a result he lost flesh, until his weight had decreased twenty-five pounds; that he gradually grew weaker, until he walked with difficulty and was confined

to the house; that the cough which accompanied the disease grew more harassing; that after he abandoned the treatment, he put himself under the care of Doctors Crabb and Willard, at Deer Lodge; that upon examination they found him suffering from no disease other than tuberculosis, and, in addition to the usual remedies resorted to to check the disease, they prescribed life in the open air and plenty of wholesome food, including milk and eggs; that he thereupon began to gain flesh and to increase in strength and weight, a condition which continued until the time of the trial; that there is no such school recognized as a Chinese or "generation" school, such as that to which plaintiff claimed to belong, so-called because defendant had "inherited the right to practice from his grandfather," having established rules and regulations; that the concoction of herbs administered by him had only a cathartic effect and was destitute of any curative virtue whatever for tuberculosis or any tendency to retard its progress, but, on the contrary, aided the disease by permitting its ravages to go unchecked; and that this mode of treatment naturally resulted in injury to the plaintiff. Though the defendant testified that he had had long preparation by study in China and experience by extensive practice in treating tuberculosis, his testimony failed to disclose any established rules or methods of practice which he observed and which guided him in diagnosing diseases or in treating them. On the contrary, his testimony disclosed that he was profoundly ignorant of the circulation of the blood or the relations of the various organs of the body or their several functions or where the pulse is situated. It showed conclusively that he was simply a charlatan, without skill or scientific knowledge, who made it his business to practice upon the ignorant and unwary for gain.

It is the rule, recognized by the courts generally, that when one holds himself out as a physician or surgeon, whether licensed or not, and accepts employment as such to treat a patient, he assumes toward the patient the obligation to exercise such rea-

sonable care and skill in that behalf as is usually exercised by physicians or surgeons of good standing, of the same system or school of practice in the community in which he resides, having due regard to the condition of medical or surgical science at that time. (*Pike* v. *Honsinger,* 155 N. Y. 201, 63 Am. St. Rep. 655, 49 N. E. 760; *Nelson* v. *Harrington,* 72 Wis. 591, 7 Am. St. Rep. 900, 1 L. R. A. 719, 40 N. W. 228; *Longan* v. *Weltmer,* 180 Mo. 322, 323, 103 Am. St. Rep. 573, 64 L. R. A. 969, 79 S. W. 655; *Force* v. *Gregory,* 63 Conn. 167, 38 Am. St. Rep. 371, 22 L. R. A. 343, 27 Atl. 1116; *Small* v. *Howard,* 128 Mass. 131, 35 Am. Rep. 363.) "This rule is elementary and has its foundation in most persuasive considerations of public policy. Its purpose is to protect the health and lives of the public, particularly of the weak and credulous, the ignorant or unwary, from the unskillfulness or negligence of medical practitioners, by holding such practitioners liable to respond in damages for the results of their unskillfulness or negligence. Moreover, it is a rule which the law has evolved out of the relation of physician and patient, rather than out of any particular contract, either specific or implied, in fact or in law. That relation is the result of a consensual transaction that need not be a contract, and its existence is a question of fact. On the relation of physician and patient there is predicated by the law the duty of the physician to exercise the requisite skill and care, and such duty is affected not at all by the fact that the service rendered is gratuitous, or by the fact that the physician was employed by a third person, so that no contractual relation existed between him and the patient." (21 R. C. L., p. 379.)

The rule was recognized by this court, though not stated as fully as above, in the case of *Stevenson* v. *Gelsthorpe,* 10 Mont. 563, 27 Pac. 404. It will be observed that under it the liability of a physician or surgeon in any particular case is to be determined by an answer to the inquiry whether he has pursued the rules and regulations of the system or school to which he belongs. The law, however, is not concerned so much about the

school to which he claims to belong, nor where he gained the qualifications necessary to enable him to practice. It is concerned about the fidelity with which he has met his obligations, and whether he has acquitted himself in the treatment of the particular patient, according to the measure of the standard of those of recognized schools who practice in the same or similar communities.

In the case of *Nelson* v. *Harrington, supra,* the court was called on to decide the question whether one who holds himself out as a clairvoyant physician, there being no recognized school designated as a clairvoyant school, having fixed principles or formulated rules for the treatment of diseases, should be held to the standard which is applicable to ordinary physicians. On this subject the court said: "To constitute a school of medicine, under this rule, it must have rules and principles for the guidance of all its members, as respects principles, diagnosis and remedies, which each member is supposed to observe in any given case. Thus, any competent practitioner of any given school would treat a given case substantially the same as any other competent practitioner of the same school would treat it. One school may believe in the potency of drugs and bloodletting, and another may believe in the principle *similia similibus curantur;* still others may believe in the potency of water, or of roots and herbs; yet each school has its own peculiar principles and rules for the government of its practitioners in the treatment of diseases. Not so, however, with clairvoyant practice. True, the practice has but one mode of ascertaining what the disease is and the remedy therefor. This mode has already been stated. But the mode in which a physician acquires a knowledge of his profession has nothing to do with his school or system of practice. One person may acquire such knowledge from certain books; another from certain other books, which perhaps teach different principles; still another from oral communications, as lectures, *etc.*, or from experience alone; and still another from his intuitions when in an abnormal mental

state; yet these differences do not necessarily constitute separate schools of medicine. The clairvoyant and the practitioners of the allopathic or homeopathic system may belong to the same school or system, provided they adopt the same principles and observe the same rules of treatment. The methods by which a man acquires a knowledge of medical science is one thing, and the principles and rules which govern him in practice of medicine is another and very different thing. This is just the difference between clairvoyant physicians as a class, and the practitioners of a school or system of medical practice recognized in the general rule of professional ability above laid down.'' The court concluded that, there being no recognized school of clairvoyant medicine, the defendant was properly held liable by the trial court, on the ground that, having held himself out as other physicians, he had not met the requirements of the rule of law applicable to them. So the supreme court of Missouri, in *Longan* v. *Weltmer, supra,* held that a magnetic healer was liable to a patient to whom the defendant administered treatment which, in the opinion of ordinary physicians, could not be justified by the rules of recognized schools, though they knew nothing of the principles of magnetic healing.

In the case of *Musser's Exr.* v. *Chase,* 29 Ohio, 577, the supreme court of Ohio held that a farmer who held himself out as a cancer doctor having skill and experience in the treatment and cure of cancer, came within the rule which ''requires the exercise of such skill and care as are usually possessed and employed by the general physician in the treatment of such maladies.''

Counsel cite the case of *Spead* v. *Tomlinson,* 73 N. H. 46, 68 L. R. A. 432, 59 Atl. 376, as conclusive of their contention. In that case the facts were that the plaintiff, through her interest in the doctrines of Christian Science and the cures which defendant professed to be able to perfect through the agency of prayer, was induced to employ him to cure her of an attack of appendicitis. He undertook the cure for a reward, but, the

malady growing worse, the plaintiff placed herself under the charge of a surgeon, submitted to an operation and was cured. She then brought action against the defendant for damages for malpractice. The trial court directed a verdict for the defendant. On appeal the supreme court affirmed this action, on the ground that there was no evidence showing negligence by the defendant in his treatment under the Christian Science practice, and that one who holds himself out as a Christian Science healer and is employed to give treatment by the methods adopted by such practitioners is required to possess only the knowledge and exercise the care and skill of the ordinary Christian Scientist. The court said: "What the parties mutually expected was that the defendant would treat the plaintiff according to Christian Science methods; and it necessarily follows that the defendant in the treatment of the plaintiff is to be judged by the standard of care, skill and knowledge of the ordinary Christian Scientist in so far as he confined himself to these methods." That case has no application to the facts of this case for the reason that the defendant, as shown by his advertisement, professed to be able to cure any kind of chronic disease, while the plaintiff knew nothing of his skill or knowledge, nor did he know anything of his methods. All he knew, so far as the evidence discloses, was that defendant was a Chinese physician who professed to be able to cure his malady.

The evidence tending to show that the plaintiff was injured and the amount of damages he is entitled to recover is not very satisfactory; it does furnish a basis, however, for the inference that he suffered some injury. In our opinion, the amount of the verdict—$2,500—is excessive; but as no complaint is made of it on this ground, we do not think we should disturb it.

It is contended that the court erred in refusing to submit instruction referred to as 15B, requested by the defendant. It is not pointed out by counsel in what respect there was error in refusing this instruction, nor wherein defendant suffered prejudice. Upon examination of the charge as a whole, we

think it fully covered every phase of the case and was as fair to the defendant as he was entitled to demand.

The judgment and order are affirmed.

*Affirmed.*

ASSOCIATE JUSTICES HOLLOWAY, HURLY, MATTHEWS and COOPER concur.

Rehearing denied January 26, 1920.