No. 13488

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

---

IRENE TALLBULL, VERNON TALLBULL,
EDMOND TALLBULL, as the surviving heirs, et al.,

Plaintiffs and Appellants,

-vs-

RICHARD WHITNEY, THE CITY OF FORSYTH,
MONTANA, and the COUNTY OF ROSEBUD, MONTANA,

Defendants and Respondents.

---

Appeal from:  District Court of the Sixteenth Judicial District,
Hon. Alfred B. Coate, Judge presiding.

Counsel of Record:

For Appellants:

Robert H. Skaggs argued, Helena, Montana
Cate, Lynaugh, Fitzgerald & Huss, Billings, Montana

For Respondents:

Anderson, Symmes, Forbes, Peete & Brown, Billings, Montana
Weymouth D. Symmes argued, Billings, Montana
Crowley, Haughey, Hanson, Gallagher & Toole, Billings,
Montana

---

Submitted:  March 18, 1977

Decided:  MAY 11 1977

Filed:  MAY 11 '977

Thomas J. Kearney
                                                    Clerk

Mr. Justice Frank I. Haswell delivered the Opinion of the Court.

In a medical malpractice action, summary judgment was granted in favor of defendant physician by the district court of Rosebud County. Plaintiffs appeal.

Plaintiffs are the surviving heirs of Henry Tallbull and the administratrix of his estate. Defendants are Dr. Richard Whitney, a Forsyth, Montana physician; the City of Forsyth; and Rosebud County, Montana.

The action alleges medical malpractice and abandonment of treatment by Dr. Whitney upon Henry Tallbull resulting in his death on February 16, 1973. In general terms, pretrial discovery indicated that the immediate cause of death was an infection that had spread throughout Tallbull's body following an apparent breaking of an abscess in his groin. Numerous possible secondary complicating conditions were disclosed including alcoholism and withdrawal effects, diabetes, tuberculosis, and urinary tract infection.

In early February, Dr. Whitney had hospitalized Tallbull in the Rosebud County Hospital where he embarked upon a course of treatment. Defendants city and county are alleged to have removed Tallbull from the hospital and incarcerated him in jail on the instructions of Dr. Whitney but without legal grounds, interrupting Tallbull's course of treatment and jointly contributing to his ultimate death.

After his release from jail, Tallbull consulted Dr. Jon Kay at Crow Agency, Montana. He was under Dr. Kay's care from February 6 until the early morning hours of February 16 when he was transported to the Deaconess Hospital in Billings, Montana, for a superpubic cystostomy. Tallbull died as soon as he arrived there.

On March 13, 1976, plaintiffs deposed Dr. Kay. His deposition

testimony comprises the only expert opinion evidence of malpractice on the part of Dr. Whitney.

On June 17, 1976, the district court granted Dr. Whitney's motion for summary judgment on the sole ground that Dr. Kay could not testify as a matter of law under the Montana "locality rule". Plaintiffs appeal from the summary judgment granted Dr. Whitney. The claims of plaintiffs against the City of Forsyth and Rosebud County are not involved in this appeal.

The underlying issue on appeal is whether Dr. Kay is competent to testify as an expert medical witness on the standard of care required of Dr. Whitney.

The core of plaintiffs' position is that a physician who is familiar with the standard of medical practice in "the same or a similar community in Montana" is competent to testify as an expert medical witness concerning the required standard of care and breach thereof alleged to constitute medical malpractice. Plaintiffs' argue that a reasonable interpretation of Montana's "locality rule" does not bar the testimony of a treating physician who did not practice in the precise community where the alleged malpractice occurred. Plaintiffs' point out many undesirable results that would follow if Montana's "locality rule" were given a "narrow and stifling application" requiring actual practice in the particular town as a requirement of competency to testify.

The principal contention of defendant is that Dr. Kay is not competent to testify because he is not familiar with the standard of medical care either in Forsyth or a similar community in Montana. Defendant argues that Montana's existing "locality rule" requires a physician to conform to the standard of medical care in the community in which he practices; that there are valid reasons for retention of this rule in Montana regardless of justification for its abandonment in metropolitan areas; and that Dr.

- 3 -

Kay is not competent to testify concerning the standard of medical care in Forsyth because he admits unfamiliarity with it. Additionally defendant claims that even if Montana's "locality rule" is broadened to include "similar communities", Dr. Kay is incompetent to testify because he is not familiar with the standard of medical care in any community in Montana similar to Forsyth.

For a collection of cases on the general question here involved, see Anno: 37 ALR3d 420, <u>Malpractice Testimony</u>: <u>Competency of physician or surgeon from one locality to testify, in malpractice case, as to standard of care required of defendant practicing in another locality</u>.

At the outset, it is important to note that the sole basis of the district court's summary judgment is the interpretation and application of Montana's "locality rule" to the competency of Dr. Kay as an expert medical witness on the standard of medical care. The district court acknowledged the existence of a factual dispute concerning the question of the alleged negligence or malpractice of Dr. Whitney and specifically stated that " * * * The only question decided by this Order is the 'locality rule'. * * *" As this was the only question considered or decided by the district court, we limit our decision on appeal to this single issue.

The factual foundation for Dr. Kay's competency as an expert medical witness on the standard of medical care required of Dr. Whitney is contained in Dr. Kay's deposition. The deposition was taken in Billings, Montana on March 13, 1976. It discloses that Dr. Kay is presently practicing pediatrics and general medicine in Potsdam, New York, a town of about 16,000 drawing from a population of about 50,000. He received his B.A. degree from Stanford University in 1965 and his M.D. from Columbia

University in 1969. He interned at Harlem hospital in New York for 8 months in medicine and four months in pediatrics from 1969 to 1970. He then completed a two year residency in pediatrics at Strong Memorial Hospital in Rochester, New York. He was employed by the United States Public Health Service, Indian Health Service, at the Crow Indian Hospital, Crow Agency, Montana, from July, 1972 to June, 1974.

Dr. Kay is licensed to practice in New York and in California but was not licensed to practice in Montana since he was practicing at a federal facility. In his practice at Crow Agency, Dr. Kay generally serviced the population on the Crow and Northern Cheyenne Indian Reservations. He had examined and treated Henry Tallbull following Dr. Whitney's treatment of him, and he had consulted with Dr. Whitney on Dr. Whitney's prior treatment of Tallbull.

Dr. Kay had never been in Forsyth or in the Rosebud Community Hospital. He had heard of Dr. Whitney and possibly of Dr. Cope, the other physician in Forsyth, but had never met them. He had been to St. Vincent's Hospital in Billings on about three occasions to visit patients and doctors. He had never been to the Miles City or Glendive hospitals. He had been to the Hardin, Montana hospital three or four times. He had not been to the Sheridan, Wyoming hospital. Dr. Kay had had professional discussions of patients and medical problems with physicians in Hardin and Billings and had examined records of patients he was treating who had been treated by other physicians in the area.

Dr. Kay's deposition testimony on his familiarity with the standard of medical care is summarized and focused in the following questions and answers. On direct examination by plaintiffs' attorney, Dr. Kay testified:

"Q. During the time you were at Crow Agency, did you become familiar with the standard of medical

- 5 -

practice in the locality of Crow Agency, Eastern Montana, Forsyth area? A. Yes, I did."

On cross-examination by defendant's attorney, Dr. Kay testified:

"Q. On what do you base your testimony that you are familiar with the standards of practice in Forsyth, Montana? A. I'm not exactly sure that I said I'm familiar with the practice in Forsyth, Montana, per se. I don't think I ever said that. If I did I will have to see it." (Emphasis supplied.)

Prior decisions of this Court have stated Montana's "locality rule" in varying language. In earlier times, Montana's rule has stated that a physician or surgeon assumes the obligation to his patient of exercising such reasonable care and skill "as * * * is usually exercised by physicians or surgeons of good standing, of the same system or school of practice in the community in which he resides, having due regard to the condition of medical or surgical science at that time " and that the law is primarily concerned with whether the physician has acquitted himself in the treatment of a particular patient " * * * according to the measure of the standard of those of recognized schools who practice in the same or similar communities". Hansen v. Pock, 57 Mont. 51, 59, 60, 187 P. 282. The rule has been stated in terms of the standard of practice of the school of medicine to which the physician belongs in the community in which he resides. Louden v. Scott, 58 Mont. 645, 194 P. 488; Dunn v. Beck, 80 Mont. 414, 422, 260 P. 1047.

More recently, in the case of a dentist, we have stated:

"A dentist who undertakes to treat a patient assumes duty to that patient to exercise such reasonable care and skill as is usually exercised by a dentist in good standing in the community in which he resides." Negaard v. Feda, 152 Mont. 47, 53, 466 P.2d 436; To the same effect applied to a physician, see Collins v. Itoh, 160 Mont. 461, 503 P.2d 36.

We have also quoted with approval from Dunn, the rule that requires a surgeon in his treatment of a patient to "employ such a degree of skill and diligence as surgeons practicing in the general

neighborhood, pursuing the same line of practice, ordinarily display in like cases." Doerr v. Movius, 154 Mont. 346, 350, 463 P.2d 477. We have also stated the standard of medical care in terms of "the general medical custom and practice of [the physician's] community". (Bracketed material substituted.) Montana Deaconess Hospital v. Gratton, ____Mont.____, 545 P.2d 670, 33 St.Rep. 128.

The value of these cases in measuring the precise boundaries of Montana's locality rule is questionable. Varying statements of the rule can be excised from the opinions in these cases supporting locality limitations to "the community in which [the physician] resides", "the same or similar communities", or "the general neighborhood". However, none of the Montana cases presented the issue involved in this appeal. In our view, we must resort to logic rather than Montana precedent in determining this issue.

Initially we observe that the foundation of the "same locality" rule no longer exists. A good description of its underlying basis is:

> "The original reason for the 'locality rule' is apparent. When there was little inter-community travel, courts required experts who testified to the standard of care that should have been used to have a personal knowledge of the practice of physicians in that particular community where the patient was treated. It was the accepted theory that a doctor in a small community did not have the same opportunities and resources as did a doctor practicing in a large city to keep abreast of advances in his profession; hence he should not be held to the same standard of care and skill as that employed by doctors in other communities or in larger cities * * *." Pederson v. Dumouchel, 72 Wash.2d 73 431 P.2d 973. Also see Warnock v. Kraft, 30 C.A.2d 1, 85 P.2d 505; Hundley v. Martinez, W.Va. (1967), 158 S.E.2d 159, 167; Gist v. French, 136 C.A.2d 247, 288 P.2d 1003.

Today the accessibility of medical literature; the frequency and availability of national, regional and state medical meetings; advances in communication of medical knowledge; and transportation

advances, to name a few, no longer isolate the physician in a rural community in Montana from the opportunities and resources of physicians practicing in the same medical community in the more populous regions of this state. See Harney, Medical Malpractice, 1973 edition, Sec. 3.3, p. 95, and cases cited therein. While cogent reasons may still exist for differentiation of the standard of care required of physicians practicing in large metropolitan areas of the east, midwest, and coastal regions of this country from that of a rural physician in eastern Montana, such reasons are based on other considerations not applicable to particular medical communities within this state.

Another reason against limiting the locality rule to the standard of care in the specific rural town involved is that the customary practice there may itself constitute negligence. In our view, the customary practice in a rural town is not the sole test of acceptable medical practice or the standard of medical care required; rather it is but one factor in determining the required standard and is not conclusive in itself. For obvious reasons, the required standard of medical care in a rural town should not be determined exclusively by the usual and customary medical practices of one or two physicians who practice there. For a more detailed rationale, see Prosser Torts, 4th Ed., p. 165; Toth v. Community Hospital at Glen Cove, 22 N.Y.2d 255, 239 N.E.2d 368; Morgan v. Sheppard, Ohio App. (1963), 188 N.E.2d 808; Darling v. Charleston Community Memorial Hospital, 33 Ill.2d 326, 211 N.E.2d 253.

Finally, considerations of public policy persuade us to reject the view that Montana's "locality rule" should be limited to the particular rural town where the physician practices. If such a limiting rule were to prevail, the patient for practical purposes would be deprived of any effective remedy for malpractice

in many cases. Hundley, supra, explains this factor in the following language:

> "' * * * The well known reluctance of doctors to testify against one another, which has been mentioned now and then in the decisions, may make this [expert medical testimony] difficult or impossible to obtain.' Therefore, if a plaintiff in a malpractice action is not permitted to obtain expert testimony of a physician who practices outside the domain of the defendant doctor, he may be denied completely the opportunity of proving the negligent acts of which he complains."

In accord: Christy v. Saliterman, 288 Minn. 144, 179 N.W.2d 288; Sampson v. Veenboer, 252 Mich. 660, 234 N.W. 170; Johnson v. Winston, 68 Neb. 425, 94 N.W. 607; Carbone v. Warburton, 11 N.J. 418, 94 A.2d 680.

In a rural town where actual substandard medical care exists, restricting the locality rule to the standard of medical care in that particular town would measure the physician's diagnosis and treatment of his patient by an impermissible standard. This policy consideration has been stated in this manner in Restatement of Torts, 2nd, Sec. 299A, note (g):

> "Allowance must be made also for the type of community in which the actor carries on his practice. A country doctor cannot be expected to have the equipment, facilities, experience, knowledge or opportunity to obtain it, afforded him by a large city. The standard is not, however, that of the particular locality. If there are only three physicians in a small town, and all three are highly incompetent, they cannot be permitted to set a standard of utter inferiority for a fourth who comes to town. The standard is rather that of persons engaged in similar practice in similar localities, considering geographical location, size, and the character of the community in general."

Additionally, such a limitation of the "locality rule" to the specific rural town removes an incentive for improvement of medical care there. Defendant emphatically points out the difficulty that some rural eastern Montana towns have in securing and retaining physicians as justification for the limiting rule. While this situation is undoubtedly true in some cases, the logic

of this approach is questionable. It appears to be based on the proposition that a negligent physician offering substandard medical care is preferable to no physician at all. We decline to accept this simplistic statement of the available alternatives. Many factors not germane to the issue on appeal may well contribute to this situation. And if this logic were to prevail, some rural eastern Montana towns might well be permanently deprived of the standard of medical care to which they are entitled by removal of an incentive to improvement.

For the foregoing reasons, we hold that Montana's "locality rule" imposes on a physician undertaking the care of a patient the legal duty of possessing and exercising that reasonable and ordinary degree of learning, skill and care possessed and exercised by physicians of good standing of the same school of practice in the same or similar locality in Montana. A similar locality in Montana within the meaning of this rule is a locality of similar geographical location, size, and character in a medical context.

Is Dr. Kay competent to testify as an expert medical witness on the standard of care required of Dr. Whitney in his diagnosis and treatment of Henry Tallbull under the foregoing locality rule? Dr. Kay's medical training and knowledge are not in dispute. His familiarity with the standard of practice in Forsyth or a similar locality is the focus of the dispute. The specifics of his familiarity as contained in his deposition have been previously set out. In general, his deposition indicates that while he is unfamiliar with the standard of care in Forsyth per se, he is familiar with the standard of practice in Crow Agency, in eastern Montana and in the Forsyth area. He recounts the basis for such familiarity in his deposition. A basis is laid in his deposition showing the locality in which he practiced is similar to Forsyth in geographical location,

size and character from a medical standpoint. We hold, there-fore, that Dr. Kay is competent to testify as to the standard of medical care.

The conclusions Dr. Kay reaches concerning the required standard and its breach by Dr. Whitney are, of course, matters to be decided by the jury. They affect the weight to be given his testimony rather than his competency as a witness or the admissibility of his testimony. These issues cannot be resolved by summary judgment as they involve genuine issues of material fact. Rule 56(c), M.R.Civ.P.

For the foregoing reasons the summary judgment granted Dr. Whitney is vacated and the cause is remanded to the district court of Rosebud County for further proceedings.

_____
                                Justice

We concur:

_____
Chief Justice

_____

_____
Justices

. . . . . . . . . . . .

Mr. Justice John Conway Harrison specially concurring:

I concur in the result reached by the majority in this Opinion but not in all that is said therein.

_____
                    Justice.

- 11 -